Good morning. May it please the Court, I'm Neil Greenstein on behalf of K-Swiss. I would like to reserve two minutes for rebuttal. The count goes down, and so when it reaches two, that means you've got two minutes left. Thank you, Your Honor. What this case is about is a case of trademark infringement, trademark copying, and what we have here is a preeminent brand, FUBU, who is selling shoes throughout the United States. In fact, these shoes were sold in the hometown of K-Swiss in Westlake Village, California. They're holding these shoes out as being exclusively from FUBU. There are no other names, no other indicator of origin on these shoes other than FUBU and the K-Swiss trademarks and trade address. Now, in this Court here and below, FUBU, GTFM, Inc., through a series of shell companies, is trying to hide from the jurisdiction of this Court. How do we know that we've got shell companies going on rather than merely licensor or licensee? Well, Your Honor, what we have here is GTFM, Inc., which is the owner of the FUBU trademark. When GTFM, Inc. was sued, and what we did is we turned around since there was no indicator of origin on these shoes other than the K-Swiss marks and the FUBU mark. We went to the Patent and Trademark Office Register. We see that GTFM, Inc. was the owner. GTFM, Inc. said, we have a licensee who's been distributing this. They're going to indemnify us, and we're going to have you deal with that company. That was Anthony El. We dealt with Anthony El, who also represented that they were representing GTFM, Inc. You didn't sue Anthony El, did you? In this action, we did not. We did sue Anthony El in a separate action after we learned about their involvement in this, in connection with suing over these shoes. And also, we did obtain an injunction from Judge Schiavelli in the Central District of California against Anthony El. But that will not prevent us, or will not prevent GTFM, from turning around and selling or licensing blindly, just as in the Fonovisa case versus Cherry Auction, licensing the mark to others and say, hey, we don't know what our licensees are doing. Yeah, we're going to turn around. We're going to promote these goods. We're going to have goods on our website. This is part of a national marketing plan. Just look at the kinds of products that we have. We sell belts. We sell all sorts of clothing accessories. But you know what? We can license this mark, and we can do this blindly and let our licensees do what they want. Okay, just to be clear, I'm not sure how directly relevant it is to the case in front of us. So you sued Anthony El in federal district court. That case is finished? That case is finished. And you sued Anthony El on trademark? Correct. Okay, good. We initially sued GTFM when we learned that Anthony El was also distributing this product. We sued Anthony El in a separate lawsuit and obtained an injunction. And both cases were in the central district? Yes, they were. And why weren't they consolidated or at least put in front of the same district judge? They were in front of the same district judge, but then this case was dismissed for jurisdiction grounds, and then all the cases were actually transferred to another judge, and the other judge is the one that entered the injunction. They were all before Judge Kelleher. Yeah. Do you know this? Is Judge Kelleher hearing cases now at all? If you don't know the answer, you can just say you don't know. Yeah, I don't know the answer. He did transfer a bunch of K-Swiss cases about a year and a half ago because of the length of the cases to Judge Schiavelli. Okay. So I don't know if he's currently hearing cases. Okay, thank you. There is an outstanding injunction directed against Anthony L. Is that correct? There is, Your Honor. And that was entered by Judge Schiavelli probably, I'd say, about six months ago, eight months ago, while this case was pending. And that relates to these transactions. I mean, the injunction is to this trademark. Yes, Your Honor, to the exact shoes that are at issue here. The problem that we have here is that GTFM, FUBU, is the one who turned around. They put and they allowed their name and only their name. This is not a scenario where you have, you know, perhaps FUBU shoes and maybe you have labeling which says manufactured and distributed under license from Anthony L. When you look at the actual shoes and, Your Honor, we do have in the excerpts of record at ER 318 photographs of the shoes. I have the shoes here if the court would like to see those. But there is absolutely no indicia other than FUBU and Case Wiss' trademarks. The question immediately in front of us today is simply in personam jurisdiction, correct? Yes, Your Honor. And I think I'm correct that you've had no jurisdictional discovery at this point? That's correct, Your Honor. What ended up happening here is that we understand and we submitted evidence that FUBU has actually inspected the shoes. There is advertising on websites. It's advertising through a variety of different medium which comes to California. The products are actually sold in California. It's unlike, for example, the Schwarzenegger case, which is cited in the briefs, where that's a situation where there was harm directed solely at Ohio. They didn't expect this car dealer had no anticipation or expectation that people from California would turn around and go and buy a car in Ohio because, at that time, Mr. Schwarzenegger, Governor Schwarzenegger, likeness was shown in an advertisement. But there isn't anything to indicate that GTFM cared about California, is there? Well, in fact, GTFM markets throughout the country. GTFM has a very significant website, a lot of advertising. And in connection with that, California is a major market in this country. And this Court, I would point out, even acknowledged in the Corvent case, the Supreme Court comments, and even in the Yahoo case, turned around and said that the brunt of the harm need not be felt here in California. You only need to have jurisdictionally enough harm to establish jurisdiction. So even if California was only 10 percent of FUBU's market, and again, we have not had any jurisdictional discovery, but even if it was only 10 percent, the fact that it purposely granted a license, allowing the product to be sold here, allowed it to be marketed here, FUBU themselves have a website. The website itself is owned by GTFM, Inc., this sort of master licensor, not this GTFM LLC, which all of a sudden popped up when they were seeking relief from default, where they say that there is a sub-licensing arrangement. You've got your corporate headquarters here in California? Yes, in Westlake Village, Your Honor. So the question in part is, it's clear that the infringing shoes, if I can conclude it there, I'll say allegedly infringing shoes, just because that's not been established in front of us, but the problem shoes are sold in California, and they seem to have been bought in the very mall where your corporate headquarters are located or nearby. We understand that. And your headquarters are here. So one of the questions might be, do they know where your headquarters are, or can that knowledge be imputed to them where your headquarters are? And then the question might be, how direct was the relationship and the knowledge between this defendant and Anthony L.? And we know some of that, but maybe not a lot at this point. Your Honor, yes, the shoes were sold in Westlake Village, right in the hometown of the corporate headquarters. GTFM, Anthony L., all of them, just like we turned around and determined that it was GTFM that owned the trademark, they could have gone up and looked at the Patent Office website and learned that K-Swiss was located in California. And for all you know, maybe they did. They may well have. We have not had that jurisdictional discovery, which I would point out at the very least we should be entitled to. I see that my time is passing, which I do want to reserve for rebuttal. Okay. Why don't you save some time, and we'll hear from the other side. Thank you, Your Honor. Good morning. Mark Brooks on behalf of GTFM. GTFM is the owner of a widely used, non-infringing trademark. That is not enough to support personal jurisdiction in California. No matter how much benefit of the doubt the Court gives K-Swiss in interpreting the evidence in the case, it will not find that GTFM engaged in an intentional act directed at the State of California. It will not find even after jurisdictional discovery? Well, Your Honor. How do we know that without having had jurisdictional discovery? Your Honor, the answer to that is that if the Court assumes the truth and allows every inference in favor of K-Swiss in this case, I submit it will still find that there is no jurisdiction. Okay. When you say if it assumes the truth, what truth are you assuming for purposes of your statement? Well, if it assumes that KTFM inspected the goods, if it assumes that KTFM ---- Approved. Excuse me? Approved the goods is the word, the verb that seems to appear in many of the papers. Well, what GTFM did upon inspection, what the legal import of that is, is really a matter of law and not subject to discovery. How do we know that? Well, the scope of GTFM's obligation to supervise the trademark is determined in law. And that is what we know they did upon inspection, because we know that that was the purpose of the inspection, to police the use of the FUBU trademark. And when you say we know, you're relying on some findings? Well, Your Honor, I think that the point is that if we accept as true that there was an inspection pursuant to GTFM's legal obligation to supervise the use of the trademark, then we know the purpose of the inspection, and we can assume that GTFM did not prevent the sale of the FUBU. I'm still a little uncertain who the antecedent of we is in this expression we know. Did Judge Fletcher and Judge Gould know? On the original instance, it would have been Judge Kelleher. And on review, it's this Court. And what is it that Judge Kelleher said that we should defer to? He simply found that there was no personal jurisdiction. I take that to mean that he indulged every inference in favor of K-Swiss in connection with the evidence. And I think the point here is that the scope of this inspection is quite limited. And even if FUBU had exercised the right to require that the FUBU trademark be removed from the shoe, it would not have prevented the sale of an infringing shoe in California because it is not the FUBU mark that is alleged to have infringed the K-Swiss mark. It's other aspects of the same shoe. If you look at any- Counsel, I have a question for you. Judge Gould. Do we have to assume that when GTFM looks at the shoes, being knowledgeable about the industry, that they would know the shoes infringe K-Swiss? Well, no, Your Honor, you do not have to assume that because the purpose of the inspection, as we know as a matter of law, is only to make sure that the shoes are of an appropriate grade and quality to bear the FUBU mark. The purpose of the inspection is not to protect other trademark holders from the independent conduct of FUBU's licensee. So you don't need to assume- What if there's an infringement in plain view when they make their inspection? Well, Your Honor- What are they supposed to- I think, first of all, this infringement, to the extent it exists, is in plain view on the shoe. Whether or not one knows that it is infringing in light of the fact that there are many participants in the shoe business, Nike, Reback, K-Swiss, Pony, Adidas, each of which has a certain trade dress, and looking at a shoe when it is not placed next to a K-Swiss shoe, one can assume that you would immediately identify that it is an infringing shoe. And so I don't think the Court needs to indulge that presumption. But I would point out that the most that can be inferred from the knowledge, even if one assumes that GTFM knew the shoe was infringing, the most that that brings to the table for jurisdictional purposes is foreseeability of harm. If we go all the way down that inference chain and indulge every presumption in favor of K-Swiss that the employee at GTFM who looked at the shoe for purposes of determining something other than infringement of another party's trademark actually did identify that it was an infringing shoe and nevertheless allowed the shoe to be sold. If we assume that before doing that, that employee or someone else at GTFM actually went to the trademark office to determine the location or headquarters of the company with the other trademark, even if we go all the way down that inference chain, which is a long and tortuous chain as to which there is virtually no evidence. Yet. Yes. Yet. Not yes, but yet. But if we do, all we get is foreseeability of harm. We do not find an act directed at the State of California, and we do not find a tort arising from that act. And we know that. Mr. Brooks, am I right in recalling that you argued to Judge Kelleher the issue perhaps arising quite late that the plaintiff should have been suing GTFM LLC? Well, Your Honor, in our opinion, the plaintiff should have been suing Anthony L. Well, I. But if they were suing any GTFM entity, they ought to have sued GTFM LLC. And we disclosed that in our original moving papers. We didn't argue it quite late in our first appearance in the case. We disclosed that. You didn't rush to appear very early in the case, as I recall. Your Honor. But what I'm wondering is this. Is it possible that you were so persuasive on that issue that that was the basis for Judge Kelleher's dismissal? I suppose that's possible. Judge Kelleher did not stake the grounds for his. The fact that he didn't stake the grounds makes it a little difficult, doesn't it, for an appellate court to know just what it would be affirming if it were to undertake to, on the basis of your argument, to affirm? Well, Your Honor. I wonder. What I'm wondering, in short, is maybe discovery is needed to find out whether the alternate, the potential defendant is what Judge Kelleher had in mind, or any of a number of other explanations of why he would have found the lack of personal jurisdiction, and that maybe we needed more information. Well, Your Honor, the standard of review on personal jurisdiction is de novo. And if this Court finds that there is no personal jurisdiction on any ground, then that would pretty much end the inquiry, irrespective of Judge Kelleher's grounds. I guess it's that, whether we have possibly a basis on this record, on this very attenuated record, to make any such finding. I'm a little puzzled by how one would write an opinion for this Court that would say, that would disregard Judge Kelleher's finding and make our own independent finding of the lack of personal jurisdiction. Well, Your Honor, Judge Kelleher found, based on the record before him, that there was no personal jurisdiction. It seems to me that if this Court finds that there is no personal jurisdiction on any ground, the appropriate thing to do is to affirm Judge Kelleher. But I have to say, my problem with that is, we know very little, because there has been no jurisdictional discovery. And we all know that the conventional way to go about these cases, if there's a jurisdictional dispute for purposes of impersonal jurisdiction, and there's some questions out there that may help us resolve it, we have jurisdictional discovery. Not full-fledged, but jurisdictional discovery. We've had none. Well, I think the issue of whether or not to allow discovery was a matter for Judge Kelleher's discretion, and the standard on that score would be abuse of discretion. Yeah. Well, given the record in front of me, I don't think Judge Kelleher paid much attention to that issue. Well, Your Honor, I guess our point is that indulging every inference in favor of case risk. There is no personal jurisdiction, because there is no act directed at the State of California by GTFM. There isn't even one alleged. And the standard for determining whether discovery ought to have been allowed is whether or not that discovery is likely or reasonably likely in some way to uncover evidence that we can. Mr. Brooks? It's Judge Gould. You know, we have a lot of areas of the law where we say someone intends the probable consequences of their acts. So part of my problem, Your Honor, relating to whether there should be discovery, is that if I infer that the shoes were seen and that FUBU or, you know, GTFM knew they infringed case risk and knew they were in California, then it would seem to me that it might be thought that a natural consequence of letting them be sold would be they would cause harm in California to case risk. Why don't we need discovery to assess that if that's a valid line of analysis? I think the answer can be found in the Schwarzenegger decision and Judge Fletcher's decision there, which disaggregates the act directed at California from the foreseeability of harm as it must. In this case, the act of inspecting the goods, which has to be disaggregated from even the most direct consequences of that act, is not in any way directed at California. Once you import the notion that mere knowledge that Anthony L.'s third-party conduct is going to cause injury in California, you've conflated the requirement that there be an act directed at the State of California with the foreseeability of the harm, which is exactly what the effects test is trying not to do, but to keep them apart. I knew I wrote a really interesting opinion on Schwarzenegger. I didn't know it was that interesting. Well, I found it interesting. And, again, once you find the act... You're running over your... you have run over your time. I'm sorry. I don't want to cut you off in mid-sentence. I just want to tell you you're over. So if you could summarize a little bit, and then the bench may have some more questions for you. Yes, I felt that I had ended, but I wanted to answer... Of course. Finish your answer, and then we'll go from there. But, in any event, there are no acts here directed at the State of California. The only acts that affected the State of California are the third-party acts of Anthony L. And our acts, GTFM's acts, no matter how much one indulges the presumptions about what occurred here, not only were not directed at California, but are not the acts from which the cause of action arises. Thank you. Okay. Further questions to the bench? I don't want to cut off questions from the bench. Okay. Thank you very much. Thank you. And, Mr. Greenstein, you've saved a little time. Thank you, Your Honor. I just want to address a couple of issues here. Mr. Drix talks about strictly the foreseeability, that this is not more than a foreseeability. And I would point out that this is significantly much more than a foreseeability. If we turn to your Schwarzenegger decision, where that was harm that was arguably directed only at Ohio, the analogy here might be, well, okay, GTFM gave a license to sell the shoes only east of the Mississippi River. It may be foreseeable that people will buy those shoes and bring them back to California, and there would be harm back in California. But GTFM, FUBU, did something more here. They licensed this product to be sold throughout the entire country, to be sold in California. There was a marketing plan. There are websites. There's advertising. Plain and simple, there was purposeful direction in California. Whether it was the majority, the brunt of the harm, that's not the issue anymore. But clearly there is more than just this simple foreseeability by virtue of a license, and FUBU knew that this was going to be sold throughout California. After all, it holds itself out as being a preeminent brand of the outdoor look. With respect to the notice to FUBU, to GTFM, the Trademark Office Register, it's not at all uncommon. In fact, commercially reasonable and regularly done, when somebody turns around and sells products, they turn around and they check out the trademarks that are on the product. Would FUBU say that if the Nike mark or the Nike swoosh was on the product that they didn't have to, that they weren't deemed to know about it, that there wasn't constructive knowledge? That's what the register of the Patent and Trademark Office is for. And, in fact, several of our registrations are there, easily obtainable on the register.  The statutory provision would then do business as constructive notice? Under the Lanham Act, and this was not discussed in the briefs, and this is strictly from memory, but I believe it's around Section 1072, 15 U.S.C. 1072, in that area, where it provides that registrations on the principal register of the United States Patent and Trademark Office are constructive notice to the public of the existence, validity, and ownership of the registration. But notice in the sense that you're now using it as an active ingredient that was to put GTFM in a position to know that we're doing something bad in California. Well, that's what the purpose of the constructive notice statute is, is that when you go out and you get a trademark registration, that is notice to third parties who are intending to use a trademark that is similar, that is the same or confusingly similar to the original. Wasn't it really there? Wasn't that statutory provision inserted in order to deflate the innocent infringement defense that had been apparently established at common law? Wasn't that what Congress was doing? Well, certainly under Section 3035 or 3036 of the Trademark Act, and that can be translated back out into the 15 U.S.C. sections, there is a provision certainly for innocent infringers in a remote geographic area. But that's really a very different aspect here. What we're talking about here is notice so that people can turn around. Instead of ordering like a lot of companies do a full commercial search, which would include state registrations, federal registrations, common law rights, that people should be able to rely upon what is on the patent and trademark office register. That's the constructive notice. That should be at least the very first step when somebody is turning around and selling a product to make sure it's not on the federal register because there is constructive notice. If it's not on the federal register, then maybe somebody will be enjoined, but there won't be damages because they can show that they were innocent. But once you turn around and you register, that is available, and nowadays and even at the time that we were talking while this case was going on and while these shoes were being sold, the federal register is easily available on the Internet with a variety of different search engines. I think we've been even-handed here. You've gone over time almost as much as the other side did, so we're about there. Okay. Thank both sides for your helpful arguments. The case of the case list versus GTFM is now submitted for decision.
judges: Fletcher, Gould, Pollak